1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                 NORTHERN DIVISION

3

4    SHAWN MACKEY                            PLAINTIFF

5

     V.                    CIVIL ACTION NO. 3:23-CV-233-DPJ-ASH
6

7    JOHN PIGOTT, ET AL.                     DEFENDANTS

8

9

         30(B)(6) DEPOSITION OF THE MISSISSIPPI
10              COMMUNITY COLLEGE BOARD

11    CORPORATE DESIGNEES: JOHN PIGOTT AND KELL SMITH

12

13

        Taken at the instance of the Plaintiff on Monday,
14     March 31, 2025, in the Office of the Mississippi
            Attorney General, 550 High Street,
15         13th Floor, Jackson, Mississippi,
                beginning at 12:00 p.m.

16

17

18
                (Appearances noted herein)
19

20

21

     REPORTED BY:        Kelly D. Brentz, CSR-MS, CSR-TX, RPR
22                       AW Reporting, LLC
                         338 Indian Gate Circle
23                       Ridgeland, Mississippi 39157
                         kelly@awreporting.com
24                       601-573-0961

25

EXHIBIT 1

1    seek out Dr. Portera's firm to do a search, so I don't

2    know of anybody else that would have applied.

3        Q.    Did Andrea Mayfield apply?

4        A.    When Dr. Portera brought us the final three that

5    he had narrowed the field down to, Dr. Mayfield was one of

6    those that applied and was interviewed for the job.

7        Q.    And who were the other two?

8        A.    Shawn Mackey.  The third one, I forgot.  It was

9    a few years ago.

10        Q.    Why did the -- according to Area 21, did the

11    Mississippi Community College Board change or revise the

12    job description for executive director?

13        A.    Changed the educational requirements for the

14    position based on the fact that the board did not feel it

15    necessary to have someone with a doctorate degree to run a

16    small agency like we have; changed the requirements

17    because they thought it would open up the field for more

18    applicants because we weren't exactly sure what role

19    Accelerate Mississippi would have in the future of the

20    Community College Board; probably the fact that the salary

21    would be lower -- and, again, I'm thinking of -- I don't

22    know if it's in the minutes or not, but we were looking at

23    changing the salary of the director to a lower amount.

24        Q.    Why didn't the board feel that it was necessary

25    to have someone with a Ph.D. to lead the agency?

1    have been granted since the pay was set at 175?

2        A.    I believe only one, but, again, I would -- check

3    the payroll records.  That's probably public record.

4        Q.    And on this 175, should the minutes reflect when

5    the board voted to set the pay at 175 for the executive

6    director's position?

7        A.    It should be in the minutes.

8        Q.    Why was Kell Smith selected on behalf of the

9    Mississippi Community College Board -- can you tell me why

10   Kell Smith was selected as both the interim executive

11   director and the executive director of the Mississippi

12   Community College Board?

13       A.    Kell Smith was initially selected by the board

14   as the interim in order for the candidate -- to put a

15   director in temporarily that we did not foresee to be a

16   candidate for the full-time job.

17       Q.    So is that the reason why Kell Smith was

18   selected, because the board wanted to put in someone who

19   would not be a candidate for the job -- for the full-time

20   job?

21       A.    That was one of the points.  We also wanted

22   someone that would help be a peacemaker with the

23   relationships between the presidents and staff.  There had

24   been some chaos with the retirement of Dr. Mayfield.  We

25   were not in a rush to appoint someone else.

1       Q.   So you said the board wanted someone who could

2   be a peacemaker.  Was Kell Smith the only person who could

3   be a peacemaker?

4       A.   And he also was not foreseen to be a candidate

5   for the position.

6       Q.   My question was, was Kell Smith the only MCCB

7   employee who could act as a peacemaker?

8       A.   I can't speak on behalf of the board on that,

9   because that's who they chose.

10      Q.   But you are here today to speak on behalf of the

11  board.  You're saying the board has no explanation?

12          MS. DOWDLE:  Object to the form;

13      mischaracterizes testimony.

14      A.   The minutes will obviously record that Kell was

15  chosen.

16      Q.   (By Ms. Ross)  Right.  But would you agree with

17  me that the minutes don't say anything about Kell being

18  chosen because he was the peacemaker?

19      A.   That's not the sole reason.

20      Q.   Okay.  I know, but would you agree with me on

21  this question, that the minutes does not -- do not reflect

22  that he was chosen because he was perceived to be a

23  peacemaker?

24      A.   I think all the minutes will reflect that he --

25  all the minutes will probably say is that he was appointed

1    interim director could not be interested in becoming the

2    executive director?

3              MS. DOWDLE:   Object to the form;

4    mischaracterizes testimony.   But you can answer.

5    A.    Let me think about the question for a minute.

6              THE WITNESS:   Would you read that back to me?

7              (The reporter read the requested portion.)

8    A.    The board realized that Dr. Mackey was most

9    likely going to be a candidate for the job when it opened.

10   Because of that, they wanted to choose an individual that

11   they did not foresee to be a candidate for the position.

12              There were probably other staff members that

13   would have also been applying, so we really, truthfully,

14   did not want to hire someone -- appoint someone as interim

15   that we thought could be a candidate for the position.

16   Q.    (By Ms. Ross)  And who were the other staff

17   members who you -- the board thought would be applying?

18   A.    I'm sure a number of names were kicked around in

19   executive session.  I don't remember all of them.  We did

20   have one that applied -- one that called me -- she never

21   applied -- also requesting to come see me and discuss the

22   job, and I told -- that's when I -- I made it clear to

23   them that I was one of ten members on the board, that it

24   was not me to decide who to --

25   Q.    All right.

1          Q.    Okay.  And you can't point the Court to any

2     minutes or any other document where the board -- that

3     reflect that the board discussed the qualifications that

4     the person needed to serve as executive director; correct?

5          A.    There are no documents that I'm aware of.

6          Q.    As it relates to the executive director's

7     position, did the board assign scores to the candidates or

8     use score sheets?

9          A.    We did not use score sheets.

10         Q.    And did the board maintain the notes of all of

11    the individuals or trustees who participated in the

12    decision to select Kell Smith?

13         A.    All notes that were known have been turned over.

14         Q.    Why was Kell Smith selected as the executive

15    director?

16         A.    Speaking on behalf of the board, they felt like

17    that Kell Smith was qualified for the job, had done a good

18    job during the interim period, and the board decided to

19    appoint him full-time director.

20         Q.    And what was it about Kell Smith that made him

21    qualified for the position of executive director?

22         A.    Kell Smith did an excellent job.  He met the

23    qualifications that were present at the time he was

24    appointed.

25         Q.    And what were those qualifications, sir?

1          A.    I don't have the qualifications at my fingertips

2     on that, but the bottom line was, looking at the final

3     three candidates, the selection committee had narrowed it

4     down to three, left the board to interview the last three

5     and make their decision.

6          Q.    And who were the final three candidates?

7          A.    Shawn Mackey, Steve Miller, and Kell Smith.

8          Q.    You mentioned that Kell Smith had done an

9     excellent job.  When had he done an excellent job?

10         A.    Good question.

11         Q.    You can answer it.

12         A.    From the time he was hired as interim director,

13    we had heard no complaints.  He was able to bring the

14    staff together.  The presidents were happy with the

15    interim director choice, the few we talked to, and it's

16    all anecdotal there.  Speaking on behalf of the board, the

17    board was please with the job that was being done.

18         Q.    Now, the presidents, what presidents are you

19    referring to?

20         A.    Again, it's anecdotal.  I attended a few of the

21    MACC meetings.  I don't know the dates or which presidents

22    I talked to personally, but they all were happy with the

23    job that Kell was doing, the ones that I spoke to, and I

24    did not talk to all 15.

25         Q.    And MACC is the Mississippi Association of

50

1          Q.   Okay.  Does it state anywhere in this document

2     that Kell Smith was a peacemaker, sir; "yes" or "no"?

3               MS. DOWDLE:  Objection; asked and answered.

4          Q.   (By Ms. Ross)  You can answer the question.

5          A.   I answered.

6          Q.   You can answer the question, sir.

7          A.   You have read the document yourself.

8          Q.   No, no, but this is for the record; "yes" or

9     "no"?

10         A.   I do not see anywhere in the document -- I see

11    that Mr. Smith was hired based on qualifications,

12    interview and his performance as interim executive

13    director.

14         Q.   And what qualifications -- what objective --

15    what qualifications were objectively evaluated of Kell

16    Smith?

17         A.   That's hard to parse out individually to exactly

18    what each and every board member's thoughts were.  All I

19    can tell you is that the board decided to hire Kell Smith

20    based on his qualifications, as stated on his resume, as

21    based on his interview performance, and as based on his

22    job as interim.

23         Q.   And like the board members who voted to hire

24    him, Kell Smith is white as are the board members?

25               MS. DOWDLE:  Object to the form.  You may

1              answer.
2              A.    That is correct.
3              Q.    (By Ms. Ross)  Now, the IHL does not govern
4     MCCB, does it?
5              A.    They do not.
6              Q.    So this paragraph about IHL, does it have -- why
7     is it in this letter to the EEOC?
8                   MS. DOWDLE:  Object to the form.  The witness
9              has already testified he didn't author this document.
10             Q.    (By Ms. Ross)  On behalf of the agency, sir?
11             A.    I can't answer it.  I did not write that.
12             Q.    And in its -- how old is MCCB now, sir?
13             A.    I think it was formed in -- reaching back --
14    Mr. Smith might can answer better than me -- 1986.
15             Q.    So at the time this letter was written, it was
16    36 years old.  How old is it now?
17             A.    '86 to today, I don't know what month it was
18    born, but do the math, it's been 25 -- 41 years.
19             Q.    And in its 41 years, it's never had an African
20    American executive director; correct?
21             A.    Not to my knowledge, and looking at the list, I
22    don't think so, no, ma'am.
23                  (Pause.)
24                  MS. DOWDLE:  Did you need to clarify your
25             testimony?

AW Reporting
601-573-0961