IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SHAWN MACKEY                                              PLAINTIFF

V.                        CIVIL ACTION NO. 3:23-CV-233-DPJ-ASH

JOHN PIGOTT, ET AL.                                      DEFENDANTS


ORAL DEPOSITION OF WILLIAM POE SYMMES


Taken at the instance of the Plaintiff on Tuesday, September 17, 2024, in the Office of the Mississippi Attorney General, 550 High Street, 13th Floor, Jackson, Mississippi, beginning at 9:34 a.m.


(Appearances noted herein)


REPORTED BY:      Kelly D. Brentz, CSR-MS, CSR-TX, RPR
                  AW Reporting, LLC
                  338 Indian Gate Circle
                  Ridgeland, Mississippi 39157
                  kelly@awreporting.com
                  601-573-0961

EXHIBIT 2

```
 1    a lot of the information electronic now as opposed to a
 2    newspaper arriving at your door.
 3         Q.   Did you participate in the interview of Kell
 4    Smith?
 5              MS. JOHNSON:  Object to the form.
 6         A.   Which interview?
 7         Q.   (By Ms. Ross)  Well, any interview?
 8         A.   I did.
 9         Q.   Okay.  And tell me how many interviews.
10         A.   I attended the three finalists' interviews which
11    I believe was on January 19th of 2023.
12         Q.   And this was for the executive director's
13    position?
14         A.   Correct.
15         Q.   Did you participate in an interview of Kell
16    Smith for the interim executive director's position?
17         A.   No.
18         Q.   Did you participate in a vote to name Kell Smith
19    interim director?
20         A.   I did.
21         Q.   Did you take any notes during the interviews?
22         A.   I remember looking at the resumes.  I don't know
23    if I took notes or not.  I don't recall taking any notes.
24         Q.   Who were the three finalists whose interview you
25    sat in on?
```

```
 1         A.    Steve Miller, Kell Smith, Dr. Mackey.
 2         Q.    How did the process work -- the selection
 3    process?  Because you said you sat in on the finalists'
 4    interviews.  Does that mean that you didn't sit in on any
 5    other interviews?
 6         A.    There was a committee formed that dealt with
 7    most of it, and then all of the trustees were invited to
 8    attend the finalists' interviews, and those were the ones
 9    I attended.
10         Q.    I'm going to show you some documents y'all
11    produced and ask you, does any of this handwriting belong
12    to you?
13               (Pause.)
14         A.    No, much neater than I can write.
15         Q.    It's Document 700 and 702, 706, 709 and 710,
16    MCCB documents.  So --
17               MS. JOHNSON:  Is that an exhibit?
18               MS. ROSS:  No, it's not.  If you want to look at
19         it, I'm saying for the record what it is.
20               MS. JOHNSON:  Let me just write those numbers
21         down.
22               MS. ROSS:  Okay.
23         Q.    (By Ms. Ross)  So how did the -- how were the
24    three finalists selected?
25         A.    I can say general -- I was not involved in the
```

```
 1          A.    He had mentioned in the discussion that he had
 2    some -- a business -- an LLC that had some rental
 3    properties and that was just part of the discussion of how
 4    much during the week did that LLC -- did he have to commit
 5    time to.   Same thing with the boards; he had a lot of
 6    boards listed, you know, how much did that eat into his
 7    workweek, his weekly obligations, and...
 8          Q.    Was there any other differences between Kell
 9    Smith and Shawn Mackey which led you to vote for Kell
10    Smith as the executive director?
11          A.    I felt that Kell came across in his interview as
12    more of a team player, meaning that whatever the job
13    needed, he would do it.   He had worn multiple hats
14    obviously in the interim process.   Being an old offensive
15    lineman, teamwork is important to me and the guys that say
16    "I" a lot usually were problematic in a team environment
17    and that was very important to me.
18                What we got in his deposition was very similar
19    to what we had that day in that there was a lot of "I did
20    this," "I did that," and, to me, that just comes across as
21    problematic when you have got to be part of the team, and
22    that was just in my analysis, anyway, something that I
23    have seen having issues in the past when it's about that
24    person and not about the overall good of the group, the
25    team.
```

```
 1    able to continue to handle his previous position if he had
 2    been named executive director?
 3         A.   I don't recall anybody telling me that.
 4         Q.   So this "I" stuff that you said that Mackey was
 5    talking about, that's subjective; right?
 6         A.   Well, I think that any time you're looking at
 7    three qualified candidates, at some point, it becomes
 8    subjective.  People look for certain things.  In my
 9    situation, I'm looking for teamwork and how people relate
10    to others.
11              Also, he had moved around a lot, apparently, he
12    talked about in his deposition.  To me, that's a red flag
13    that maybe somebody has issues getting along with people.
14    So there is multiple things that went into my decision
15    process.  None of it was race.
16              MS. ROSS:  I need to go off the record.
17              (Recess.)
18         Q.   (By Ms. Ross)  So these three candidates that
19    were finalists, did you rank them at all?
20         A.   Did I what?
21         Q.   Did you rank them?
22         A.   Did I rank them?
23         Q.   Did you rank the candidates?
24         A.   I didn't.
25         Q.   Did -- was there a vote held on each candidate?
```

```
 1            MS. JOHNSON:  Object and instruct him not to
 2       answer anything that was discussed during executive
 3       session.
 4            (Pause.)
 5       Q.  (By Ms. Ross)  So how was Mackey eliminated?
 6            MS. JOHNSON:  Same objection.  Let me clarify
 7       that.  To the extent that he has information
 8       responsive to your question outside of the executive
 9       session, he can answer.
10       Q.  (By Ms. Ross)  How did you eliminate Mackey?
11       A.  I didn't eliminate Mackey.
12       Q.  Okay.  He is not the executive director;
13  correct?
14       A.  Uh-huh.
15       Q.  And he was one of the finalists?
16       A.  (Nodded.)
17       Q.  So what do you call it?
18       A.  I chose Kell.
19       Q.  And tell me all the reasons why you chose Kell
20  over Mackey.
21       A.  I felt like he would best serve the board for
22  what our needs were because we had gone through and kind
23  of had a real hard look at what are the needs for the
24  executive director position based on what they had been
25  historically and what our real true needs are, and part of
```

```
 1    that was looking at do we still need a doctorate for the
 2    position, do -- will a master's suffice, what are the main
 3    roles that we were going to expect of the executive
 4    director.
 5            And, to me, the most primary -- I guess there
 6    were two primary concerns I saw that were the main goal of
 7    the executive director and that was being able to have
 8    legislative relationships, understand the committee
 9    process and get money that is the lifeblood of the MCCB
10    for coordinating with the community colleges and the
11    programs that we support; and the second thing was the
12    relationships with the presidents; and, I guess, third
13    would be the administration around MCCB and the person
14    that I felt would best be able to coordinate those persons
15    that were employed by the MCCB.
16            And -- but the primary one I saw above -- head
17    and shoulders above the rest was the legislative, getting
18    funding, understanding the bills, the committees, because
19    that was our lifeblood.  Without that, the others are --
20    they fall to the wayside.
21            So when we said we were, after Mayfield
22    resigned, looking at the requirements and what was going
23    to be necessary for the executive director moving forward
24    and what our priorities were going to be, that led to the
25    change as well as in the salary amount because we were
```

1  getting pressure from multiple points.  There was the
2  Accelerate Program and what it was going to be as far as
3  the cannibalizing of the role and part of what we do and
4  how much of that was going to affect funding, and also
5  looking at the amount of the salary was close to $300,000.
6       I could understand if you were a president of a
7  university.  I could understand if -- you know, my
8  understanding was we're a coordinating board and so that
9  looked excessive, and there was some pushback from other
10  areas of government as to the amount of money that we were
11  spending on our executive director.  And so all those
12  things were part of the consideration of the changing and
13  refocusing on what are we looking for.
14       And, to me, that was the most important, the
15  legislative aspect, and that's something that Kell
16  excelled in.  And I thought that he had proven that he was
17  a team player.  He had been in the position that he was in
18  for a long time.  He was more than willing to help anyone
19  in any capacity, and I just thought overall, based on
20  those things, that he was the best candidate of the three.
21      Q.  So had Mackey proven that he was not a team
22  player?
23      A.  Looking at the moving around different
24  positions, looking at his comments during his final
25  interview that I was in, it seemed to be about him, not

```
 1              MS. ROSS:  We can take a break.
 2              (Recess.)
 3       Q.    (By Ms. Ross)  I'm going to show you a document
 4   marked Mackey-37 and ask you if you have ever seen that
 5   document before.
 6              (Pause.)
 7       A.    I think I have seen it before.  I don't know
 8   when I would have seen it for the first time.
 9       Q.    When does it show that it was revised?
10       A.    Shows it was revised multiple times.
11       Q.    The last time?
12       A.    January 21 of 2022.
13              MS. ROSS:  Let's mark that.
14              (Exhibit 3 marked for identification and
15        attached hereto.)
16       Q.    (By Ms. Ross)  And that would have been after
17   Kell was named interim director -- interim executive
18   director of the MCCB?
19       A.    January 21 of 2022, yes, because it was July 16,
20   2021.
21       Q.    Did you vote to change the requirements for the
22   executive director's position to eliminate an earned
23   doctorate degree from an accredited university or college
24   in education, school administration or a related field?
25       A.    I believe I did.  The minutes will reflect if I
```

```
 1   actually did or not because, like I said, there's been a
 2   few meetings.  I didn't go back and look at all the
 3   minutes.  But I would have voted to remove it because the
 4   discussions I recall was that we wanted to open it up to
 5   have as many candidates as possible, and I didn't, as my
 6   official capacity as a board member, view that a doctorate
 7   was necessary to what our main goals were for the reasons
 8   I stated previously.
 9        Q.   And what were the main goals?
10        A.   That -- the legislative -- connection to the
11   legislature and the role that that played in the funding
12   aspect for the MCCB, the relationship with the presidents,
13   and then the -- obviously the administrative role in
14   overseeing the staff and things of that nature that were
15   part of the job description.
16        Q.   Did you ever question why Kell had only held one
17   position in the agency?
18        A.   Did I question why he only had one?
19        Q.   Yes.
20        A.   I did not question it.  I was told he did a very
21   good job at it.
22        Q.   Were you ever told that Mackey did not do a very
23   good job in the different positions that he held at the
24   agency?
25        A.   I was never told that he didn't do a
```

```
 1    reason that the agency offered for Mackey's nonselection
 2    as executive director?
 3            MS. JOHNSON:  Object to the form.  He didn't
 4        write this document.  Calling for a legal conclusion.
 5        Q.   (By Ms. Ross)  What does the document say, sir?
 6        A.   For what, now?
 7        Q.   What was -- what legitimate -- what does the
 8    agency proffer as its legitimate, nondiscriminatory reason
 9    for Mackey's nonselection?
10            MS. JOHNSON:  If you find it, you can read
11        directly from the document.
12            (Pause.)
13        A.   So what was the question again?
14            MS. ROSS:  Can you read the question?
15            (The reporter read the requested portion.)
16        A.   As it states on page 5 at the bottom and moving
17    into page 6, so 00042 to 00043, that he was not treated
18    any differently and that there was no pretext to race.  I
19    can't answer -- this speaks for the board's response.  As
20    far as my individual -- my decision as a board member had
21    nothing to do with race.
22        Q.   (By Ms. Ross)  And looking at page 5, it says
23    that there was indisputably a legitimate,
24    nondiscriminatory reason for modifying the executive
25    director's job description; correct?
```

```
 1   could meet your guy -- or their guy?  Because you're
 2   saying, at this point, you had never engaged in a
 3   conversation with them where they -- this is Johnny
 4   McRight and John Pigott, where they discussed "our guy"?
 5          MS. JOHNSON:  Object to the form.
 6      A.  I never had any discussion.  One, I don't have a
 7   guy.  I viewed all three candidates and I made my decision
 8   as a member in my official capacity based on what I
 9   thought was the best fit for what we were looking to
10   accomplish.  I didn't base it on any preferential
11   treatment.  I didn't base it on race.  I didn't base it on
12   any of that other than I felt that Kell, because of the
13   legislative connection and the importance of that, that's
14   what I put the most importance on, and so that was the
15   defining factor for me.
16          MS. ROSS:  Can we mark that?
17          (Exhibit 14 marked for identification and
18      attached hereto.)
19          MS. ROSS:  Let's go off the record for a moment.
20          (Pause.)
21      Q.  (By Ms. Ross)  Have you ever given a deposition
22   before?
23      A.  I don't think I have ever been deposed.  I have
24   had to provide testimony in court related to attorney's
25   fees on numerous occasions.
```