IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SHAWN MACKEY                                          PLAINTIFF

V.                    CAUSE NO. 3:23-CV-233-DPJ-ASH

JOHN PIGOTT, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES;
CHERYL THURMOND, IN HER
INDIVIDUAL AND OFFICIAL
CAPACITIES; VIDET CARMICHAEL,
IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES; DINNIE CAUGHMAN,
IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES; BUBBA HUDSPETH, IN
HIS INDIVIDUAL AND OFFICIAL
CAPACITIES; DOLLY MARASCALO,
IN HER INDIVIDUAL AND OFFICIAL
CAPACITIES; JOHNNY MCRIGHT, IN
HIS INDIVIDUAL AND OFFICIAL
CAPACITIES; LUKE MONTGOMERY,
IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES; WILL SYMMES, IN
HIS INDIVIDUAL AND OFFICIAL
CAPACITIES; DIANNE WATSON, IN
HER INDIVIDUAL AND OFFICIAL
CAPACITIES; AND THE
MISSISSIPPI COMMUNITY COLLEGE
BOARD                                               DEFENDANTS


CONTINUATION DEPOSITION OF JOHNNY MCRIGHT

Taken at the instance of the Plaintiff at Attorney General, Civil Litigation Division, 550 High Street, Suite 1100, Jackson, Mississippi  39205, on Thursday, March 27, 2025, beginning at 1:23 p.m.


NIKKI L. LLOYD, CCR #1870

Brooks Court Reporting
1-800-245-3376

EXHIBIT 10

```
 1      versus what we're doing.  It looked like some
 2      of our work was going to be taken away and the
 3      workforce, which Dr. Mackey and -- oh, shoot --
 4      one of the other guys were very heavily
 5      involved in.  And, you know, in the midst of
 6      all of that, I was flat out told directly that
 7      we were not going to be able to pay the kind of
 8      money that had been paid to the executive
 9      director.  So there was a lot going on there
10      that made us realize that we needed to do
11      something different --
12      Q   (By Ms. Ross) Right.  But --
13      A.   -- to try to keep things together to be
14 honest with you.  I mean, it was a -- it was a bad
15 time.  And I think -- I blame a lot of it on COVID,
16 quite frankly, because we were not meeting.  IHL
17 shut the building down.  We had to do things by Zoom
18 for I don't know how many months.  All of that was
19 going on during that time.
20      Q.  So you never told me why y'all vote --
21 why, you know, the Board believed that it was
22 necessary to lower the standards for the executive
23 director's position.
24           MS. DOWDLE:  Object to the form.
25           THE WITNESS:  There's no specific answer.
```

```
 1        There is a group of answers.  One, we were told
 2     we weren't going to be able to pay that kind of
 3     money in the future.  I was told that very
 4     directly by the Lieutenant Governor.
 5        Q    (By Ms. Ross) What Lieutenant Governor?
 6  Who was the Lieutenant --
 7        A.   Delbert Hosemann.
 8        Q.   Okay.
 9        A.   He called me and he was very specific
10  about it.
11        Q.   Okay.
12        A.   I'll be honest, when he told me that, I
13  did not realize that Mayfield was making that much
14  money.
15        Q.   Well, how much was she making?
16        A.   It was like 300-.
17        Q.   And when Kell came in as an interim, he
18  was making 210-, correct?
19        A.   Do what?
20        Q.   When Kell came in as interim, he was
21  making $210,000 a year, correct?
22        A.   He was doing three jobs.
23        Q.   Okay.  Well --
24        A.   Three different jobs at the time.  We
25  asked him to do that.  And I don't remember who led
```

```
 1   I'm looking at too many different versions of the
 2   same thing.
 3        Q.   But -- and when you were creating these
 4   documents and e-mailing them --
 5        A.   I didn't create -- I didn't create these.
 6        Q.   Well, it certainly appears that you did
 7   from the e-mail.
 8             MS. DOWDLE:  Object to the form.
 9        Q    (By Ms. Ross) Okay.  Is your e-mail that
10   has the attachments the same thing that's in the
11   heading of this letter, qualifications for MCCB
12   executive director have been altered, correct?  Can
13   you read what the attachment says, what it says on
14   the attachments?
15        A.   Yeah.
16        Q.   Okay.  What does it say?
17        A.   It says the same thing, yes.
18        Q.   Okay.
19        A.   Absolutely.
20        Q.   And then read the body of it for the
21   record out loud.
22        A.   I thought already -- I didn't already do
23   that?
24        Q.   No.
25        A.   FYI:  See attached.  Please let me know
```

```
 1   your thoughts on any changes, additions, deletions,
 2   et cetera.  It is my intention to present this
 3   information to Tate, Delbert, Philip and anyone else
 4   you think we need to inform.  Please note that this
 5   is what I feel we should do, but certainly not my
 6   decision, but yours.  We can finalize and then let
 7   the search committee see it and give their thoughts.
 8   I was advised to put this in writing.  Please note
 9   that this in no way mentions or suggests that this
10   change was made in order to favor anyone in
11   particular, and it should not.  Thanks.  I await
12   your response.  Johnny.
13        Q.   Okay.  So if Johnny (sic) had sent it to
14   you, that e-mail that you sent Johnny wouldn't make
15   any sense, would it?
16        A.   I'm -- you mean, John?  I'm Johnny.
17        Q.   Yeah.  If Johnny -- well, you're Johnny.
18   And if Pigott had sent it to you, your e-mail
19   wouldn't make any sense, right?
20             MS. DOWDLE:  Object to the form.
21        Q    (By Ms. Ross) If Pigott had drafted these
22   letters and not you, your e-mail wouldn't make
23   sense --
24             MS. DOWDLE:  Object to the form.
25        Q    (By Ms. Ross) -- would it?
```

```
 1   Governor Tate Reeves or -- and you said Philip Gunn,
 2   who spoke to them, you?
 3        A.   I spoke with Delbert Hosemann.
 4        Q.   Okay.  But you said it was your intention
 5   to present it to both Delbert, Philip Gunn and
 6   Governor Reeves, correct?
 7        A.   Yes.
 8        Q.   Okay.  What prevented you from presenting
 9   this information -- and when you said this
10   information to Tate, Delbert and Philip, were you
11   referring to 5 and 6?
12        A.   I was referring -- well, I was referring
13   to changing the qualifications.
14        Q.   And the legislature didn't determine the
15   qualifications -- well, I guess they could.  In the
16   statute, does the legislature list the
17   qualifications for the executive director?
18        A.   I don't know.
19        Q.   So why were you bringing law -- lawmakers
20   into discussions about what the qualifications
21   should be?
22        A.   Because I was told by one of them that we
23   were not going to be able to pay what we had been
24   paying in the past.
25        Q.   Okay.
```

Johnny McRight 3/27/2025

```
 1   you on the same day at 11:25 about the special
 2   requirements, and you see that where he says,
 3   Regarding special requirements, is there anything we
 4   want to delete or restate?
 5        A.   I see that.
 6        Q.   Okay.  And was he referring to the
 7   executive director's job description?
 8        A.   I have no idea.
 9        Q.   When you responded to him at 3:00 on the
10   same day, what did you put in the subject line?
11        A.   At the very top of the document?
12        Q.   Uh-huh, yes.
13        A.   RE: MCCB executive director job
14   description.
15        Q.   I've just handed you a document.  And you
16   said you did not know what John was referring to
17   when he said, Regarding the special requirements, is
18   there anything we want to delete or restate?  You
19   wrote to him on April 6th of 2022 regarding the
20   attached job description, correct?
21        A.   Yes.
22        Q.   And read that first -- read that e-mail
23   that you sent to -- on April 6th of 2020.
24        A.   Attached is the executive director job
25   description, including where I highlight in green
```

```
 1    the qualities I feel our guy definitely needs to
 2    meet and I feel certain he does.  There's also one
 3    word highlighted in yellow due to some concern we
 4    have had about being tough enough.  Thinking it back
 5    through, our past leader never terminated anyone.
 6    She just transferred their responsibilities and
 7    workload to someone else and moved them to an
 8    out-of-sight office location.  Not much on firing,
 9    but who is really.
10              You want me to keep on?
11         Q.   Yes.
12         A.   I think the bigger question is whether the
13    president is going to roughshod over our director.
14    I just don't see that happening.  Even if our new
15    leader is somewhat of a passivist who does not like
16    conflict, but with recent events that I hope he
17    discussed with us, he certainly may want to and try,
18    but not -- but does not run from conflict when
19    necessary.  Seeing that and how he has handled some
20    staff issues is impressive.  Let me know your
21    thoughts when you can.  I have not sent this to
22    Cheryl, Luke or Bubba.  Just my thinking today.
23         Q.   So on the date that you wrote -- on
24    April 6th of 2022, can you tell this jury under oath
25    that you were not referring to a man as being --
```

```
 1              COURT REPORTER:  That will be Exhibit 13.
 2              (Exhibit 13 marked for identification.)
 3       Q      (By Ms. Ross) Sir, what made Kell more
 4   qualified for the position -- clearly more qualified
 5   for the position than Mackey?
 6       A.     Basically, that goes back to when we asked
 7   him to serve as the interim.
 8       Q.     Okay.  So --
 9       A.     And we did that because we were highly
10   concerned about the staff and about the relationship
11   we had -- that our board had with the school
12   presidents and -- there were a couple of things.
13   First, I knew Mackey would probably apply for the
14   permanent job, and I knew Kell wouldn't.  I mean,
15   Kell, number one, at that time, he wasn't qualified,
16   didn't have a Ph.D.  And so my position on that when
17   some of them said, Let's do Kell, I liked the idea
18   because we got somebody in the interim that's not
19   going to, you know, try to sway things one way or
20   the other in their favor if they are not -- if they
21   ran, you know, or decided to apply.  And what we saw
22   very quickly was his capacity to mend bad
23   relationships with the Board and the staff and the
24   presidents, so that weighed very heavily in his
25   favor to be quite honest with you.
```

```
 1   just telling you it weighed very heavily.  It did.
 2        Q.   Well, would you say that the Board then
 3   had given Kell an advantage over Mackey because you
 4   can't say that Mackey couldn't have done the same
 5   things that Kell did, right?
 6             MS. DOWDLE:  Object to the form.
 7        Q    (By Ms. Ross) And the reason -- right, you
 8   can't say that, can you?
 9        A.   Ma'am, yes, I can.  I mean, to be
10   honest --
11        Q.   Okay.  How --
12             MS. DOWDLE:  Allow him to finish.
13             MS. ROSS:  Okay.
14             THE WITNESS:  -- there were issues and
15        concerns with Dr. Mackey being in that position
16        within our -- within the Board.
17        Q    (By Ms. Ross) Okay.  And what were the
18   issues and concerns?
19        A.   That he was arrogant, that he was some
20   sort -- somewhat of a bully, that he was difficult
21   and that was -- and that was -- I would call that --
22   in all fairness, I would call that other people's
23   perspective on how he was.  I mean, it's like, you
24   know, some -- somebody's feeling about how somebody
25   is doesn't necessarily mean that's how they are, but
```

```
 1   that's how they think they are, I guess is what I'm
 2   trying to say.  There were concerns there.
 3         Q.   Okay.  So now you're telling the ladies
 4   and gentlemen of the jury that y'all went out and --
 5   and -- the Board members, when you're doing --
 6   engaging in a confidential matter that is
 7   determinant, if Mackey is going to be given the
 8   position as executive director, you just went up and
 9   had side conversations with anybody who wants to
10   talk about Mackey?
11              MS. DOWDLE:  Object to the form.
12              THE WITNESS:  No.
13         Q    (By Ms. Ross) Okay.  So who told you
14   Mackey was arrogant?
15         A.   First off, other board members told me
16   about other people telling them.
17         Q.   Okay.  And for the record, all the Board
18   members are white, right?
19         A.   Yes.
20         Q.   Okay.  So who told you Mackey was
21   arrogant?  Did anyone tell you directly,
22   Mr. McRight, that Mackey was arrogant?
23         A.   I had someone -- I had people tell me --
24   several people tell me that other people -- it would
25   be secondary, you know, honestly, you know -- felt
```

```
 1   that way about it.  And then I actually was
 2   concerned about it, and I tried to actually talk to
 3   some people that I knew in the staff to get them to
 4   tell me the same thing.
 5        Q.   Okay.  So who told you that others had
 6   told them that Mackey was arrogant?
 7        A.   Other Board members.
 8        Q.   Okay.  Who -- I'm trying to -- you know, I
 9   think it's ten of y'all.
10        A.   Yes, ma'am.
11        Q.   Did all nine of them tell you?
12        A.   No.
13        Q.   So which specific ones?
14        A.   You want me to -- do I have to name who --
15        Q.   Yes.
16        A.   Diane, Luke, John, Dolly.
17        Q.   You got four right now.
18        A.   I better stop there.  I'll stop there.
19        Q.   Well, I don't want you to just stop there.
20   If there is another board member who told you that
21   Mackey was arrogant, you need to tell the ladies and
22   gentlemen of the jury who it was.
23             MS. DOWDLE:  Object to the form.
24             THE WITNESS:  Well, I don't -- I don't
25        know.  I don't know.  I don't remember.  I
```

```
 1      Q    (By Ms. Ross) And no one ever confronted
 2  Mackey with these things that people were saying,
 3  right?
 4      A.   Not to my knowledge.  I didn't.
 5      Q.   I mean, the interview would have been a
 6  perfect place to do that, right?  Mackey, we have
 7  these concerns because we keep hearing that you're
 8  arrogant -- arrogant, that you are a bully, that you
 9  are difficult to work with.  You had an opportunity
10  to go into those issues with him but did not,
11  correct?
12           MS. DOWDLE:  Object to the form.
13           THE WITNESS:  Correct.
14      Q    (By Ms. Ross) Okay.  Were there any
15  African American employees at the MCCB that you
16  talked to who made any allegations against Mackey?
17      A.   Yes.
18      Q.   Who?
19      A.   I'm not going there.
20      Q.   Okay.
21      A.   Can I -- can I refuse to answer that
22  question?
23           MS. DOWDLE:  No.  You need to answer the
24      question.
25           THE WITNESS:  Cynthia.  I don't -- I'm
```

```
 1         sorry.  I don't like this at all.
 2         Q     (By Ms. Ross) And who else besides Cynthia
 3   Jiles?
 4               (Discussion off the record.)
 5               THE WITNESS:  I'm sorry.  I'm trying --
 6         there was -- there was another lady.  I
 7         cannot -- I'm sorry.
 8         Q     (By Ms. Ross) What did Cynthia Jiles tell
 9   you about Mackey?
10         A.    That he was a bully.
11         Q.    He's a bully.
12         A.    (Nonverbal response.)
13         Q.    Now, she's the human resources person,
14   right?
15         A.    Yes.
16         Q.    And if she identifies a bully in the
17   workplace at MCCB, there are procedures to follow,
18   correct?
19         A.    I would think so.
20         Q.    Okay.  And did she ever show you any
21   procedures or any written complaints that she
22   received?
23         A.    Nope.
24         Q.    Okay.  So if Mackey is a bully in the
25   workplace, isn't it true that MCCB employees can
```

```
1       Q.   But not in public sector jobs, right?
2       A.   Oh, public.  I'm sorry.  None.  I hadn't
3   had any experience in the public sector until I
4   got -- got involved in this.
5       Q.   So you said these reports, though, that
6   came from the employees harmed Mackey's chances of
7   being named executive director?
8       A.   Yes, ma'am, they did.
9       Q.   Okay.  And, now, did you speak to -- did
10  you ask any of the staff about Mackey?
11      A.   Yes.
12      Q.   Okay.  Who did you ask about Mackey?
13      A.   I tried -- I did -- I actually tried
14  talking to several that wouldn't talk to me.  And,
15  golly, I had to get -- got Jason -- I finally got
16  Jason to talk to me.
17      Q.   Jason Carter?
18      A.   Yes, ma'am.
19      Q.   He's white?
20      A.   Yes, ma'am.
21      Q.   What did he say?
22      A.   His concern was other staff members that
23  were concerned.
24      Q.   And who were the staff members who he
25  claimed were concerned?
```

```
 1      A.   I do not know.  He said there were
 2  several.  And he said he was worried that -- and
 3  I'll tell you something, he did not want to talk to
 4  me.  He did not.  Neither he nor Cynthia wanted to
 5  talk to me.  But I felt like somebody needed to get
 6  to the bottom of it.  You know, what is the problem?
 7  If there's a problem, somebody tell me what the
 8  problem is, and it was like pulling teeth.
 9      Q.   Did Jason ever say that he had been
10  bullied by Mackey?
11      A.   No, ma'am.
12      Q.   Or that he had ever witnessed Mackey
13  bullying someone?
14      A.   No, ma'am.
15      Q.   Did he tell you that Mackey was arrogant?
16      A.   He told me that others felt like he was.
17      Q.   Is that against the law --
18      A.   Arrogance?
19      Q.   -- being arrogant?
20      A.   No, ma'am.
21      Q.   Okay.  And that's really subjective, isn't
22  it?
23      A.   Absolutely.
24      Q.   Okay.  Because, I mean, I could call you
25  arrogant or some other businessman could call you
```

```
 1   arrogant, but you could be just confident, correct?
 2              MS. DOWDLE:  Object to the form.
 3              THE WITNESS:  Correct.
 4        Q     (By Ms. Ross) Was the Board fearful that
 5   all of your white employees would leave --
 6              MS. DOWDLE:  Object to the form.
 7        Q     (By Ms. Ross) -- if Mackey was named --
 8        A.    Ma'am, it was not -- no.
 9        Q.    Wouldn't you say you were unfair to Mackey
10   if you had these reasons for disqualifying him for
11   the position?  Excuse me.  I'm sorry.
12        A.    That was my foot.  I'm sorry.
13        Q.    I'm sorry.
14              If you had these reasons for disqualifying
15   him, but you never explored them with him to get his
16   side?
17              MS. ROSS:  Object to the form,
18         mischaracterizes testimony.  You may answer.
19              THE WITNESS:  I don't know how to answer
20         that because I was just trying to find out if
21         there's anything to it.  What is going on?
22         What is the problem?  And, yes, we had people
23         worried that if Mackey got the job, they were
24         going to lose their job and they were not
25         white.
```

```
 1        Q.   And to this day, we still don't have
 2   anyone who's filed any sort of complaint on
 3   bullying?
 4        A.   As far as I know, you're correct.
 5        Q.   And any other complaint that alleges that
 6   Mackey has violated any rule established by MCCB?
 7        A.   Correct.
 8        Q.   So going back to my question, you said
 9   that as far as education and experience are
10   concerned, that you cannot say that Kell Smith was
11   clearly more qualified than Mackey, and it was the
12   18 months of experience that Kell gained as the
13   interim that gave him an edge?
14             MS. DOWDLE:  Object to the form,
15        mischaracterizes testimony.  You may answer.
16             THE WITNESS:  I wouldn't word it like
17        that, quite honestly, because I don't think it
18        was the 18 months of experience that he gained.
19        I think it was our witness of how things got
20        better so much quicker.  We went from the
21        frying pan to a much better, smoother
22        operation.  Everybody's getting along,
23        everybody seems happy with what's happening.
24        Okay.  Now we're fixing to have to go and hire
25        somebody permanent, which gives us the risk of
```

```
 1        it going the other way.  So we're saying, how
 2        do we keep things going smooth like they're
 3        going?  Now, that's where I was.  I can't speak
 4        for nine other people.  I can only tell you
 5        where I was with this.
 6        Q    (By Ms. Ross) Okay.  But y'all deceived
 7   the public, right?
 8             MS. DOWDLE:  Object to the form.
 9        Q    (By Ms. Ross) When y'all claimed that
10   y'all picked Kell because he was just going to be in
11   there until y'all could find someone else.  So y'all
12   always knew that you were going to put somebody else
13   in a position, correct?
14             MS. DOWDLE:  Object to the form.
15        Q    (By Ms. Ross) That's what y'all had
16   claimed falsely, correct?
17             MS. DOWDLE:  Object to the form.
18             THE WITNESS:  No, ma'am.
19        Q    (By Ms. Ross) You falsely claimed that
20   Kell was just going to be interim, correct?
21             MS. DOWDLE:  Object to the form.
22             THE WITNESS:  We had no idea that Kell
23        would even consider applying for the job when
24        we put him at interim.  We put him at interim
25        because I knew he didn't want the job.
```