IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SHAWN MACKEY                                                    PLAINTIFF

V.                                          CIVIL ACTION NO. 3:23-cv-233-DPJ-ASH

JOHN PIGOTT et al.                                           DEFENDANTS

DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

## I.    SUMMARY OF CLAIMS AND ARGUMENTS

Plaintiff Sean Mackey (Mackey or Plaintiff) raises three causes of action based on alleged race discrimination stemming from one operative fact—he was not chosen as Executive Director of Mississippi Community College Board (MCCB): (1) Title VII (against MCCB only), (2) 42 U.S.C. § 1981 through §1983 (against each member of the MCCB Board (Individual Defendants) in their official capacities for prospective relief only), and (3) the Equal Protection Clause of the Fourteenth Amendment through §1983 (against the Individual Defendants in their official capacities for prospective relief only). [44, ¶ 36]. While Mackey fails to raise a single cause of action against the Individual Defendants in their individual capacities, he nonetheless seeks "actual, compensatory, and incidental damages" and "liquidated and punitive damages" against them in their individual capacities. *Id.*, p. 10, Section V, Claims for Relief at ¶¶ b and e.[1]  All of Mackey's claims should be dismissed for the reason discussed below.

Mackey's Title VII claim against MCCB fails because even assuming he establishes a prima facie case, MCCB has legitimate, non-discriminatory reasons for selecting Kell Smith

---

[1] To be clear, Mackey only mentions the individual capacity Individual Defendants in the "Parties" section and his prayer for relief against all Defendants pursuant to 42 U.S.C. § 1981(a), which governs damages.  However, he fails to assert a single cause of action for any purported individual capacity claims.

(Smith) as Executive Director, and Plaintiff cannot establish pretext.[2] Likewise, Plaintiff's §1981 and Equal Protection claims against the Individual Defendants in their official capacities also fail for the same reasons. Regardless, instatement is not feasible prospective injunctive relief where, as here, an innocent employee, Smith, must be displaced. Despite seeking money damages against the Individual Defendants in their individual capacities, Mackey failed to assert a single cause of action against them—and those damage claims should be dismissed for that reason alone. Defendants are not required to guess what causes of action are asserted against them, but regardless, should the Court construe these damages claims to arise under §1981 and/or the Equal Protection Clause, those claims fail on the merits—and the Individual Defendants, in their individual capacities, are entitled to qualified immunity.

## II.    FACTS AND PROCEDURAL HISTORY

### A.    Undisputed Facts

Created in 1986, MCCB's mission is to advance the community college system in Mississippi through coordination, leadership, support, and advocacy. www.mccb.edu. MCCB operates as a coordinating board and receives and distributes funds appropriated by the legislature and other sources for use by the state's fifteen (15) community colleges. *See* Miss. Code Ann. § 37-4-3 (6).

There are ten (10) individual board members of the MCCB, all of whom are named Defendants in their official and individual capacities (Individual Defendants),[3] who are appointed by the Governor, and whose six-year appointment terms are staggered. *See* Miss.

---

[2] Defendants will assume that Mackey can establish a *prima facie* case under Title VII for summary judgment purposes only.

[3] The Individual Defendants include: MCCB Board Chair, John Pigott, Chair of the Search Committee Chair, Johnny McRight, Cheryl Thurmond, Videt Carmichael, Donnie Caughman, Bubba Hudspeth, Dolly Marascalco, Luke Montgomery, Will Symmes, and Dr. Dianne Watson.

Code Ann. § 37-4-3(2). None of the Individual Defendants receives a salary from MCCB, and they are entitled only to a $40 per diem compensation for days devoted to official MCCB duties.  Miss. Code Ann. § 37-4-3(4).

Mackey, who is African-American, claims that he was racially discriminated against, and that current MCCB Executive Director Smith, a white male was (1) initially unqualified to serve as Interim Executive Director in 2021, and (2) that the educational requirements for Executive Director were changed to favor Smith, who was hired as Executive Director in January of 2023.  Mackey contends that MCCB's "single decision of hiring a less qualified white" Smith as Executive Director is "the moving force behind the violations of Mackey's constitutional and statutory rights."  [1,¶17].

Mackey and Smith were two of the applicants who made it to the final interview stage for Executive Director in January of 2023. *Ex. 1*, p. 23:6-7; *Ex. 2*, pp. 35:24-36:1. Smith was hired as Executive Director and Mackey was not.[4] Mackey and Smith both have had lengthy careers with MCCB:  Mackey began in 2007 and Smith in 2008, and both advanced in their careers with MCCB over the years. [1, ¶18]; *Ex. 3*, pp. 20:20-21:3. During the relevant time, Mackey served as Deputy Executive Director for Accountability, a position he currently holds, and Smith was Director of Communications and Legislative Services. *Ex. 3*, pp.17:9-17; 75:17-23; *Ex. 4*, p. 63:12-22.

1. <u>**Prologue: Dr. Andrea Mayfield's Tenure as MCCB Executive Director**</u>

Mackey's claims begin with the final months of former MCCB's Executive Director Andrea Mayfield's (Mayfield) tenure.  In 2015, Mayfield was hired as Executive Director, following the retirement of Dr. Eric Clark. *Ex. 4*, pp. 16:2-5; 34:5-35:5. Prior to Mayfield's hire, Deborah Gilbert (Gilbert), a white female served as Interim Executive Director.  *Ex. 4,*

---

[4] The other finalist candidate who was interviewed for Executive Director was Dr. Stephen Miller, a white male. *Ex. 5*, p. 148:2-3.

p. 71:17-24; *Ex. 22*. When Gilbert served as Interim, she did not hold a Ph.D. *Id.* Similarly, Smith did not (and does not) hold a Ph.D. when he was named Interim in July of 2021. *Ex. 3,* p.36:18-22; *Ex. 22*. Mackey contends that Smith should not have been named Interim because Smith's highest degree was (is) a Master's degree. However, there is no record evidence that Mackey complained about Gilbert's educational level when she was appointed Interim. Significantly, Mackey was positioned to make any such concerns known, as he was one of three finalists who interviewed for Executive Director in 2015, along with Mayfield. *Ex. 4,* p. 36:15-20; *Ex. 6,* p. 68:11-21; *Ex. 5,* p. 111:19-20.

Mayfield's tenure with MCCB began successfully, but problems emerged, and eventually Mayfield was seen by board members as the problem. *Ex. 6,* p. 37:22-25. Mayfield's relationship with several community college presidents soured, and word of these strained relationships filtered back to some Individual Defendants. *Ex. 6,* p. 39:3-6; *Ex. 7,* pp. 25:1-12; 32:7-16; *Ex. 8,* p. 25:1-10. Mayfield's territorial confrontations with members of Accelerate MS[5] and the state Workforce personnel also filtered back to MCCB. *Ex. 6,* pp. 39:16-24; 43:16-18. The upshot was that Mayfield alienated MCCB from other state agencies, and alienated MCCB staff and several community college presidents. *Ex. 6,* p. 44:2-7. These problems were exacerbated by circumstances created by the remote meetings during the Covid-19 pandemic and negatively impacted MCCB workplace morale. *Ex. 6,* pp. 44:17-45:1. MCCB Board President Pigott testified as to the situation that resulted in MCCB offering Mayfield to tender her resignation or be terminated. *Ex. 5,* pp. 36:4-38:13.

---

[5] Accelerate MS is a separate state agency formed in 2020 that serves to collaborate and promote workforce development throughout Mississippi. www.acceleratems.org. This was a function that MCCB previously served prior to the formation of Accelerate MS. During the relevant time, MCCB had much confusion and anxiety about the precise role Accelerate MS would take, and whether it would displace MCCB regarding workforce training all together. *Ex. 5,* pp. 49:17-20; 124:14-125:1; *Ex. 6,* p. 38:19-24.

The July 16, 2021 Minutes of the MCCB Board Meeting reflect that the Board went into executive session. Upon emerging from executive session, Mayfield tendered her resignation, and the Board announced that Smith would serve as Interim until a permanent Executive Director was named. *Ex. 9.* The Board members present appointed Smith as Interim.[6] *Id.*

### 2. Smith's Tenure as Interim Executive Director

Mackey contends that everything from this point (July 2021) forward regarding the Interim and permanent Executive Director search and hire (January 2023) was motivated by the Defendants' unlawful racial discrimination against him, but the record is devoid of evidence of this. Regarding Smith's selection as Interim, Pigott testified:

> Q:    [Ms. Ross] At that time you were aware that Kell Smith had never sought to be the executive director of the Mississippi Community College Board, correct?
>
> A:    That is correct. That was one of the main reasons that he was selected as someone that probably would not—at that point in time would not have had an interest in becoming the executive director.
>      And we needed someone to smooth the waters, if you will, with the [community college] presidents, probably with some of the [MCCB] staff. . . . And I think the general thought of the board—and, again, I'm trying to think of things that were said—was to put Kell in for probably at least four to six months just to get the water smooth, get relationships smoothed out, bridges rebuilt, if you will, and then pursue searching for another director.

*Ex. 5,* pp. 49:8-50:2.

Defendant Montgomery, one of the Executive Director search committee members, likewise testified that Smith was considered as someone who, at the time, was not seeking to be Executive Director, and who got along well with the MCCB staff and could have a stabilizing effect. *Ex. 8,* p. 36:4-10; s*ee also, Ex. 10,* p. 73:2-25. Defendant Thurmond testified that when Smith was named as Interim, the MCCB trustees were looking for someone who

---

[6] Defendant Symmes was not present for the July 16, 2021 meeting and did not vote on the Interim. The Individual Defendants present for the July 16th board meeting included: Pigott, Thurmond, Carmichael, Caughman, Hudspeth, Marascalco, McRight, Montgomery, and Watson. *Ex. 9.*

was not interested in becoming the permanent Executive Director, and that Mackey would

likely apply for the Executive Director position since he was a finalist for the position when

Mayfield was hired in 2015.

> Q:    [Ms. Ross] And can you tell me anyone else who was considered besides him
>        [Kell Smith] for the interim director's position?
>
> A:    I believe that that we noted or discussed that probably Dr. Mackey and possibly
>        Dr. Rachel DeVaughan would be interested in the job – or interested in
>        applying, yes.
>              But the reason we chose Kell is because we thought – we wanted to do
>        things right. We wanted to—we wanted—I personally—let me say it this way,
>        I personally thought Kell was a good choice because I did not think he would
>        be interested in the job, and that's – that's the truth.

*Ex. 11*, pp. 50:16-51:3

When asked if Smith was selected as Interim because of his race, Defendant

Carmichael testified "There's – race doesn't enter into the picture at all with me, no. . . .

Again, race had no point at all." *Ex. 23*, p. 50:5-19. Defendants have consistently testified

that neither Smith nor Mackey's race played a role in the decision to name Smith as Interim

or hire him in January of 2023 as the Executive Director: *See, e.g.: Ex. 5*, pp. 51:9-52:20; *Ex.

11*, pp. 93:21-94:14; *Ex. 7*, p. 48:7-24; *Ex. 2*, pp. 45:6-15; 84:19-21; 110:6-15; *Ex. 12*, p. 33:15-

25. Pigott, who was a MCCB Rule 30(b)(6) designee, testified as follows:

> Q:    [Ms. Ross] And what qualifications—what objective—what qualifications were
>        objectively evaluated of Kell Smith?
>
> A:    [Pigott] That's hard to parse out individually to exactly what each and every
>        board member's thoughts were. All I can tell you is that the board decided to
>        hire Kell Smith based on his qualifications, as stated on his resume, as based
>        on his interview performance, and as based on his job as interim.

*Ex. 1,* pp. 50:14-51:2. Each time Mackey's counsel inquired if Smith or Mackey's race was the

basis for any of the Defendants' actions, they have denied it. *Ex. 5*, pp. 51:9-52:20; *Ex. 11,*

pp. 93:21-94:14; *Ex. 7*, p. 48:7-24; *Ex. 2*, pp. 45:6-15; 84:19-21; 110:6-15; *Ex. 13*, p. 33:15-25.

3. **Changing the Executive Director Educational Requirements**

The MCCB Board has one employee, the MCCB Executive Director.  Prior to January of 2022, the minimum educational requirements Executive Director included: "An earned doctorate degree from an accredited college or university in education, school administration, or a related field.  Eight (8) years of experience in education, five (5) of which must have been in educational administration, is required. *Ex. 13*. In early 2022, the "Minimum Core Requirements" for Executive Director were changed to: "At least a master's degree in any field, and evidence of experience in administration, leadership, and engagement of others at regional, state, or national levels." *Ex. 14.*

Smith served as Interim from July of 2021 until he was hired as the Executive Director in January 2023. *See Exs. 9 and 15.* This change in the educational requirements was made during Smith's term as Interim. *See Ex. 20.* Mackey contends that the job requirements for the position were changed to (1) favor Smith because of Smith's race and/or (2) disfavor Mackey because of his race.  Plaintiff also contends that the *length* of time Smith served as interim (approximately 18 months) was to unlawfully allow Smith to become seasoned to become the eventual Executive Director. [44, ¶32].  The record evidence supports neither contention.

The rationale for changing the educational requirements is directly related to the length of time MCCB took to fill the position permanently. There were practical political realities, budgetary concerns, concern for keeping MCCB subordinate staff satisfied, and a desire to repair good relations with the administration of Mississippi's fifteen community colleges. *Ex. 2,* pp.46:19-48:20; *Ex. 16,* pp. 30:13-31:2; *Ex. 6,* pp.74:12-17; 75:8-20.  Facing pressure from law makers, MCCB also reduced the Executive Director's salary by over $100,000—from $280,000 to $175,000.  *Ex. 2,* p. 48:1-11; *Ex. 10,* p. 26:5-9; *Ex. 3,* p.17:21-25. Defendant McRight and others testified regarding all of these matters:

Q:    [Ms. Ross]: And why were the standards lowered?

      . . .

A:    [Defendant McRight] It was—it was—it was a very complicated issue.  We had
      had issues with Dr. [Andrea] Mayfield's relationship with her staff.  We had
      problems with her relationship with the [community college] presidents.  I
      don't like to use the word "chaos," but, I mean, even [Plaintiff] Dr. Mackey
      expressed the same concern.  I mean, we basically had a mess on our hands
      and what we were looking at was several things.  The Accelerate [MS] thing
      had started.  They had basically offended our group.  They had offended Dr.
      Mayfield in – not directly, but what were they going to do versus what we're
      [MCCB] doing.  It looked like some of our work was going to be taken away and
      the workforce, which Dr. Mackey . . . [was] very heavily involved in.  And, you
      know, in the midst of all that, I was flat out told directly that we were not going
      to be able to pay the kind of money that had been paid to the executive director.
      So there was a lot going on there that made us realize that we needed to do
      something different.

      . . . .

Q:    So you never told me why y'all vote[d] – why, you know, the Board believed
      that it was necessary to lower the [educational degree] standards for the
      executive director's position.
      . . .

A:    There's no specific answer.  There is a group of answers.  One, we were told we
      weren't going to be able to pay that kind of money [salary] in the future.  I was
      told that very directly by the Lieutenant Governor.

*Ex. 10,* pp. 26:20-27:4

Email exchanges between Pigott and McRight also show that the change to the

educational requirements had nothing whatsoever to do with race:

      "FYI: See attached [job description].  Please let me know your thoughts on any
      changes, additions, deletions, et cetera.  It is my intention to present this information
      to [Governor] Tate [Reeves], [Lieutenant Governor] Delbert [Hosemann], [Former
      Speaker of the House] Philip [Gunn] and anyone else you think we need to inform.
      Please note that this is what I feel we should do, but certainly not my decision, but
      yours.  We can finalize and then let the search committee see it and give their
      thoughts.  I was advised to put this in writing.  Please note that this in no way
      mentions or suggest that this change was made in order to favor anyone in particular,
      and it should not.  Thanks.  I await your response . . ."

*Ex. 21*; *Ex. 10,* p. 41:25-42:12.

As McRight testified, the concerns of lawmakers as to the Executive Director's salary were considered:

> Q:     [By Ms. Ross]: So why were you bringing law – lawmakers into discussions about what the qualifications [for Executive Director] should be?
>
> A:     Because I was told by one of them that we were not going to be able to pay what we had been paying in the past.

*Ex. 10*, p. 45:19-22.

In another email between Pigott and McRight during Smith's Interim tenure (April 6, 2022), the two discussed Smith's performance as Interim and the revisions to the Executive Director job description:

> [McRight to Pigott] Attached is the executive director job description, including where I highlight in green the qualities I feel our guy definitely needs to meet and I feel certain he does. There's also one word highlighted in yellow due to some concern we have had about being tough enough. Thinking it back through, our past leader never terminated anyone. She just transferred their responsibilities and workload to someone else and moved them to an out-of-sight office location. Not much on firing, but who is really. . . . I think the bigger question is whether the president is going to roughshod over our director. I just don't see that happening. Even if our new leader is somewhat of a passivist [sic] who does not like conflict, but with recent events that I hope he discussed with us, he certainly may want to try, but not—but does not run from conflict when necessary. Seeing that and how he has handled some staff issues is impressive. Let me know your thoughts when you can. I have not sent this to [MCCB Executive Director Search Committee Members] Cheryl [Thurmond], Luke [Montgomery] or Bubba [Hudspeth]. Just my thinking today.

> *Ex. 17 (specifically MCCB0001623); see also*, *Ex. 10*, pp. 61:24-62:22.

This testimony is consistent with that provided in the Rule 30(b)(6) deposition:

> Q:     [Ms. Ross]:  Why did the . . . [MCCB] change or revise the job description for executive director?
>
> A:     [John Pigott]:  Changed the educational requirements for the position based on the fact that the board did not feel it necessary to have someone with a doctorate degree to run a small agency like we have; changed the requirements because they thought it would open up the field for more applicants because we weren't exactly sure what role Accelerate Mississippi would have in the future of the Community College Board; probably the fact that the salary would be lower—and, again, I'm thinking of—I don't know if it's in the minutes or not, but we were looking at changing the salary of the director to a lower amount.

*Ex. 1,* p. 8:13-23.

Defendant Montgomery testified that the Ph.D. requirement was "removed to basically open it [the position] up to more candidates that we thought would be qualified to run the agency. I don't . . . – I do not think and never have thought you needed a doctorate to run that agency [MCCB]." *Ex. 8,* p. 68:5-10. Defendant Thurmond, who was briefly on the Search Committee, testified that her understanding of the reason for changing the educational requirements from Ph.D to a Master's degree was that the MCCB ". . . wanted to open it up to more people" and did not think a Ph.D. was necessary. *Ex. 11,* pp. 22:11; 22:15-18.

Similar testimony was provided by other Defendants who were—significantly—not on the Search Committee. Defendant Caughman testified:

A:     I didn't think that a – that a doctorate degree should be a requirement for our director.

Q:     [Ms. Ross] Why not?

A:     One, I didn't think an academian [sic] should be—we needed an academian [sic] in that position. This position was one more of leadership, relationships with employees and the legislature, more than having a Ph.D. And we were paying way too much for [Dr. Andrea] Mayfield. And I felt like anyone with a doctorate degree is going to demand that—almost that same kind of salary, which we all felt was way overboard.

*Ex. 7,* p. 30:5-17.

Defendant Symmes testified similarly:

Q:     [Ms. Ross]: Did you vote to change the requirements for the executive director's position to eliminate an earned doctorate degree from an accredited university or college in education, school administration, or a related field?

A:     I believe I did. . . . I didn't go back and look at all the minutes. But I would have voted to remove it because the discussions I recall was that we wanted to open it up to have as many candidates as possible, and I didn't, as my official capacity as a board member, view that a doctorate was necessary to what our main goals were for the reasons I stated previously.

Q:     And what were the main goals?

10

> A:    That—the legislative—connection to the legislature and the role that that played in the funding aspect for the MCCB, the relationship with the [community college] presidents, and then the—obviously the administrative role in overseeing the staff and things of that nature that were part of the job description.

*Ex. 2*, pp. 61:21-62:15. The record establishes that there were varying reasons for the changes to the job description and the length of time to complete the search, but none of those reasons were based upon race discrimination.

### 4.    Why was Smith chosen as Executive Director and not Mackey?

It is undisputed that Smith was chosen unanimously by the board members following the interview process.[7] *Ex. 15*. Many of the Individual Defendants have testified as to what they "preferred" or "liked" about Smith that led to their vote; others have testified as to what reservations, if any, they had concerning Mackey.  However, none of the testimony establishes that MCCB Board collectively or any of Individual Defendants voted out of racial animus.

### 5.    "Positives" about Smith

There were numerous "positives" regarding Smith performance as Interim.  Pigott testified that Smith was seen as a peacemaker with both MCCB staff and community college presidents, who had done a good job as Interim.  *Ex. 1*, pp. 15:21-23; 22:16-19.  Improving these relationships with the community college presidents was vital to MCCB at the time due to the chaos left by Mayfield.  *See Ex. 10*, pp. 26:20-27:4, 73:2-25; *Ex. 18*, pp.89:10-16. Defendant Symmes testified: "I felt like Kell came across in his interview as more of a team player, meaning that whatever the job needed, he would do it.  He had worn multiple hats

---

[7] The Individual Defendants present for the January 20, 2023 board meeting when Smith was selected as Executive Director included: Pigott, Thurmond, Caughman, Hudspeth, Marascalco, McRight, Montgomery, Symmes, and Watson.  *Ex. 15*. Defendant Carmichael was not present on January 20th, but he later voted to approve the minutes. *Ex. 23*, p. 45:10-23.

obviously in the interim process." *Ex. 2*, p. 43:11-14.  Defendant Marascalco testified that as

Interim, Smith "had done a great job, and we knew that he was well liked at the Capitol. . . .

His reports [to the Board] were spot on.  He had great rapport with some of senators and

legislators over there to talk about bills that we needed to be passed."  *Ex. 16*, pp. 30:17-31:2.

Defendant Watson testified that Smith was a peacemaker and gentle spirit, who had a good

relationship with MCCB staff, the community college presidents, and the Mississippi

legislature.  *Ex. 18*, pp. 89:14-16; 111:18-23.   Defendant Thurmond testified that she

considered both Smith and Mackey qualified for the position of Executive Director, but that

Smith was "more qualified for what we were looking for."  *Ex. 11*, p. 79:11-17.

> Q:     (By Ms. Ross) And what were y'all looking for, a white male?
>
>         MR. DANIELS:  Objection.
>
> A:     The answer to that is no.
>
> Q:     Okay.  So he was more qualified based on what?
>
> A:     He—he was qualified in his relationships with people, with people at the
>        legislature, things that we were looking for, he was very qualified for.

*Id.,* pp. 79:18-80:1.

Defendant McRight testified regarding the effect of Smith's performance as Interim

on his choice for the full-time position:

> Q:     [Ms. Ross] So going back to my question, you said that as far as education and
>        experience are concerned, you cannot say that Kell Smith was clearly more
>        qualified than Mackey, and it was the 18 months of experience that Kell gained
>        as the interim that gave him an edge?
>
>        MS. DOWDLE:  Object to the form, mischaracterizes testimony.  You may
>        answer.
>
> A:     THE WITNESS:  I wouldn't word it like that, quite honestly, because I don't
>        think it was the 18 months of experience that he gained.  I think it was our
>        [the MCCB Board's] witness of how things got better so much quicker.  We
>        went from the frying pan to a much better, smoother operation.  Everybody's
>        getting along, everybody seems happy with what's happening.  Okay.  Now
>        we're fixing to have to go and hire somebody permanent, which gives us the

risk of it going the other way. So we're saying, how do we keep things going smooth like they're going. Now, that's where I was. I can't speak for nine other people. I can only tell you where I was with this.

*Ex. 10,* pp. 90:8-91:5. Additionally, Defendant Hudspeth testified:

A:     I think the success that Kell had had with the legislature really put him above anybody as far as relations with the [MCCB] board. He—we struggled for years trying to get enough money to hold the thing together. Kell—Kell took care of that. He became active in that. He became friends with members of the legislature. They loved Kell Smith. And Kell did a wonderful, fantastic job of keeping folks' paychecks coming. And he is still doing it today.

*Ex. 12,* pp. 36:20-37:5.

6.   **Basis for Mackey's Non-Selection**

Defendants have never contended that Mackey was unqualified to become Executive Director. As the record demonstrates, however, none of the reasons Mackey was not selected have anything to do with his race.

Defendant McRight testified that there were concerns with Mackey's management style with subordinate MCCB employees:

Q:     (By Ms. Ross) Okay. And what were the issues and concerns?

A:     That he was arrogant, that he was some sort—somewhat of a bully, that he was difficult and that was—and that was—I would call that—in all fairness, I would call that other people's perspective on how he was. I mean, its like, you know, some—somebody's feeling about how somebody is doesn't necessarily mean that's how they are, but that's how they think they are, I guess is what I'm trying to say. There were concerns there.

*Ex. 10*, pp. 76:17-77:2. McRight further testified that these concerns about Mackey came from both other MCCB Board members and staff, including MCCB Human Resources Director Cynthia Jiles, who is African-American. *Id.,* pp. 78:16; 81:25-82:10. McRight also testified that he had learned from MCCB Deputy Director for Finance and Administration Jason Carter that other subordinate MCCB staff members were concerned about Mackey. *Id.,* p. 86:13-17; 86:17-87:8.

13

McRight's testimony also illustrates that concerns over Mackey's demeanor as a supervisor were not substitutes for concerns over Mackey's race. *Ex. 10,* p. 88:14-25. Defendant Caughman testified: "Ma'am I think it was not any one thing. As we've already discussed, the issues that came up about Dr. Mackey, his personality, and so forth, that raised concerns and the after hours rental houses or whatever it was he had to do also. But it was primarily a personality thing." *Ex. 7,* p. 111:17-22. Caughman had heard that Mackey "had problems getting along with employees, with people. He had people problems." *Id.,* p. 123:23-24.

Regarding Mackey's interview, Defendant Montgomery testified:

A:    I thought he [Mackey] did an okay job with his—with his interview. I thought he did an okay job with his interview. You know, one thing he touched on a lot was the fact that, you know, he had been part of every department – you know, worked in every department within the agency, and that—it was afterwards where we were talking through that and it kind of hit me that that might be a red flag, because, generally, if somebody's, you know, in a certain department doing a good job, they normally stay in a certain department. But working in every department, that's really a red flag.

*Ex. 8*, pp. 102:16-103:2

Montgomery also testified that Mackey "jockeyed" for the Executive Director position very shortly after Mayfield's resignation came to be seen as a strike against him. *Id.,* pp. 108:24-109:17. Montgomery further testified that when Pigott advised another interested candidate from within MCCB to let the job application process play out rather than lobby the board, that person did so, unlike Mackey. *Id.,* pp.109:22-110:11; *see Ex.1*, pp. 15:16-16:7. Montgomery further testified that the selection of Smith as opposed to Mackey was because: while Mackey may have been qualified, ". . . at the end of the day, he was not the best candidate . . . ." *Ex. 8,* p. 128:3-4. Whether expressed as a positive for Smith or a negative for Mackey, the record evidence demonstrates that Mackey's race was not the basis for MCCB's or the Individual Defendants' actions.

14

B. **Relevant Procedural History**

On January 20, 2023, the Individual Defendants voted unanimously as a Board to appoint Smith as MCCB's Executive Director.[8] *Ex. 15.* Aggrieved, Mackey filed an EEOC charge alleging race discrimination against MCCB on June 1, 2023. *Ex. 19.* On April 4, 2023, Mackey filed his Complaint [1] against MCCB and the Individual Defendants in their official and individual capacities. Following several separate motions to dismiss [8, 10, 19, 21, 32], this Court entered an Order [38] dismissing all §1983 claims against MCCB and all §1983 claims for money damages, including front pay against the official capacity Individual Defendants, but the Court held that claims for instatement as prospective relief could proceed, and the individual capacity Individual Defendants were not entitled to qualified immunity based on the allegations in the Complaint. On January 29, 2024, Mackey filed his Amended Complaint [44] asserting three causes of action based on alleged race discrimination: (1) Title VII against MCCB, (2) violations of the Equal Protection Claims of the Fourteenth Amendment through §1983 against the Individual Defendants in their official capacities for prospective relief, and (3) violations of §1981 through §1983 against the Individual Defendants in their official capacities for prospective relief. Extensive written discovery was conducted, along with seventeen depositions. Discovery closed on March 31, 2025, and this matter is ripe for summary judgment.

III. **SUMMARY JUDGMENT STANDARD**

"Summary judgment is appropriate when the evidence shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

---

[8] The Individual Defendants present for the January 20, 2023 board meeting when Smith was selected as Executive Director included: Pigott, Thurmond, Caughman, Hudspeth, Marascalco, McRight, Montgomery, Symmes, and Watson. *Ex. 15.* Defendant Carmichael was not present on January 20th, but he later voted to approve the minutes. *Ex. 23*, p. 45:10-23.

law." *Salinas v. AT & T Corp.,* 314 Fed. Appx. 696, 697 (5th Cir.2009) (quoting Fed. R. Civ. P. 56(c)). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant." *Agnew v. Washington Mut. Fin. Group, LLC,* 244 F.Supp.2d 672, 675 (N.D.Miss.2003) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))."When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott,* 276 F.3d 736, 744 (5th Cir. 2002).

## IV.    APPLICABLE LEGAL STANDARD

As the Court has previously recognized, the *McDonald Douglas* burden-shifting analysis applies to claims all of Mackey's claims, whether under Title VII, §1981, or the Equal Protection Clause. *Order* [38, p. 13]. Plaintiff must first establish by a preponderance of the evidence a prima facie case of discrimination. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). In circumstantial evidence cases, such as this, Plaintiff must establish:

> (1) he was not promoted, (2) he was qualified for the position sought, (3) he fell within a protected class at the time of the failure to promote, and (4) the defendant either gave the promotion to someone outside of the protected class or otherwise failed to promote the plaintiff because of his race.

*Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 346-47 (5th Cir. 2013) (citing *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)). This Court correctly noted that the "ultimate question is 'whether a defendant took the adverse action against the plaintiff *because of* her protected status.'" *Order* [38, p. 14](citing *Raj v. La. State Univ.*, 714 F.3d 322,

331 (5th Cir. 2013)(quoting *Kanida v. Gulf Coast Med. Personnel LP*, 363 F.3d 568, 576 (5th Cir. 2004)). Second, and only if the plaintiff establishes a prima facie case, the defendant then must offer a legitimate nondiscriminatory reason for promoting the employee outside of the protected class. *Mengistu v. Miss. Valley State Univ.*, 716 F. App'x 331, 334 (5th Cir. 2018). The defendant's burden is one of production rather than persuasion. *Id.* Third, once the defendant articulates its reason, the plaintiff must "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Outley v. Luke & Assocs.*, 840 F.3d 212, 216 (5th Cir. 2016).

## V.    ARGUMENT AND AUTHORITIES

### A.    The Title VII Claims Against MCCB Should Be Dismissed.

MCCB is entitled to summary judgment on Mackey's Title VII claim for failure to promote him to Executive Director. Since Mackey did not file his EEOC charge until June 1, 2023, he is precluded from including anything that occurred more than 180 days before his EEOC charge—including Smith's appointment as Interim and any changes to the educational requirements as adverse employment actions. *Ex. 19; Davis v. Fort Bend Cty.*, 893 F.3d 300, 303-7 (5th Cir. 2018)("to exhaust administrative remedies by filing a charge of discrimination to the [EEOC] within 180 days of the alleged discrimination.");*see also Black v. Mississippi Dep't of Rehab. Servs.*, No. 3:20-CV-00643-KHJ-LGI, 2021 WL 1948468, at *4 (S.D. Miss. May 14, 2021), aff'd, No. 22-60409, 2023 WL 4341459 (5th Cir. July 5, 2023)("Failure to file an EEOC Charge within the required time bars a plaintiff from relief.").

### 1.    MCCB has legitimate, non-discriminatory reasons for selecting Smith.

Assuming Mackey establishes a prima facie case of discrimination, the burden shifts to MCCB to establish a legitimate, non-discriminatory reason for promoting Smith.[9]  MCCB

---

[9] MCCB will assume that Mackey can establish his prima facie case under Title VII only for purposes of this motion, and it reserves all rights to contest his prima facie case at trial, if necessary.

has done this because it selected a qualified candidate with a long working history at MCCB with a particular ability to smooth the waters with the MCCB staff and community college presidents and an established reputation in dealing with the legislature. *Ex. 1*, pp. 12:13-13:5; *Ex. 2*, pp. 46:19-48:20; *Ex. 16*, pp.30:13-31:2; *Ex. 10*, pp.74:12-17; 75:8-20.

"An employer meets its burden of production" in this context "by proffering admissible evidence of an explanation that would be legally sufficient to justify a judgment for the employer." *Bodenheimer v. PPG Indus.*, 5 F.3d 955, 957 (5th Cir. 1993). The employer must articulate "a lawful reason, regardless of what its persuasiveness may or may not be." *Id.* at 958. The proffered reason or reasons meet that standard if the employer provides a "clear and reasonably specific basis" for its assessment, whether its reasons are subjective or not. *Alvarado v. Texas Rangers,* 492 F.3d 605, 616 (5th Cir. 2007)(citations omitted); *see also Ward v. Gray Television Grp., Inc.*, 787 F. App'x 850, 851 (5th Cir. 2019)(employer's subjective reason for its employment action satisfied its burden). Smith met the qualifications for Executive Director—and simply put, MCCB believed that he was the best fit to lead the agency, particularly in the wake of the chaos left by Mayfield. *Ex. 1,* pp. 12:13-13:5; *Ex. 11,* pp. 78:22-79:17; *Ex. 2,* pp. 46:19-48:20; *Ex. 16,* pp.30:13-31:2; *Ex. 6,* pp. 74:12-17; 75:8-20.

   2. <u>Mackey cannot establish that MCCB's legitimate, non-discriminatory reasons are mere pretext for race discrimination.</u>

This puts the burden on Mackey to "demonstrate by competent evidence that the presumptively valid reasons ... were in fact a coverup for a [ ] discriminatory decision." *McDonnell Douglas*, 411 U.S. at 805. Mackey may prove a "proffered reason is pretext by providing evidence that discrimination more likely motivated the employer or that the employer's reason is unworthy of credence." *Little v. Republic Refin. Co.*, 924 F.2d 93, 96 (5th Cir. 1991). However, "[i]n conducting the pretext analysis the court does not 'engage in second-guessing of an employer's business decisions.'" *Montgomery-Smith v. George*, 810

18

Fed. Appx. 252, 262 (5th Cir. 2020)(quoting *Roberson-King v. La. Workforce Comm'n, Office of Workforce Development*, 904 F.3d 377, 381 (5th Cir. 2018)(additional citation omitted).

As pretext, Mackey will likely contend that Smith was preselected for the position. However, "preselection, in and of itself, does not establish pretext *unless the preselection was motivated by discriminatory animus.*" *Pree v. Washington Co. Brd. of Suprv.*, No. 4:16-cv-122-SA-RP, 2018 WL 522776, at *5 (N.D. Miss. Jan. 23, 2018)(citing *see Rowe v. Jewell*, 88 F.Supp.3d 647, 665 (E.D. La. 2015)(citing *Walsdorf v. Bd. of Comm'rs for the E. Jefferson Levee Dist.*, 857 F.2d 1047, 1051 (5th Cir. 1988); *Hiner v. McHugh*, 546 Fed.Appx. 401, 407 (5th Cir. 2013)). In *Pree*, plaintiff argued that a change in the job description that matched the selected candidate's skills was evidence of pretext. *Id.* However, the change to that job description benefitted both parties since they each had grant writing skills.[10]   More importantly, the plaintiff "wholly failed to bring forth any evidence of discriminatory intent or animus.   The slight evidence of preselection, without more, is insufficient to establish pretext." *Id.* (citing *see Rowe*, 88 F.Supp.3d at 665; *Walsdorf*, 857 F.2d at 1051; *Hiner*, 546 Fed. Appx. at 407).   Mackey cannot establish discriminatory animus—nor can he establish pretext based on alleged preselection.

Should Mackey claim that MCCB relied in part on subjective criteria (such as Smith's relationships with legislators and leadership skills with staff and the community college presidents) in appointing Smith, that also fails to establish pretext. "An employer's mere use of subjective criteria is *not* sufficient evidence of pretext." *Rowe*, 88 F.Supp.3d at 664 (citing *Gregory v. Town of Verona*, 574 Fed. Appx. 525, 528 (5th Cir. 2014)(citing *Manning v. Chevron Chem Co.*, 332 F.3d 874, 882 (5th Cir. 2003)). "Absent *evidence* that subjective criteria were used as a mask for discrimination, the fact that an employer based a hiring or

---

[10] The same is true here since both Mackey and Smith possess Master's degrees. The change from requiring a Ph.D. to a Master's degree certainly did <u>not</u> eliminate Mackey as an applicant.

promotion decision on purely subjective criteria will *rarely, if ever, prove pretext* under Title VII." *Id.* (citing *Manning*, 332 F.3d at 882); *accord Churchill*, 539 Fed.Appx. at 318-19; *Browning v. Sw. Research Inst.*, 288 Fed.Appx. 170, 177 (5th Cir. 2008); *Joseph*, 277 Fed.Appx. at 440-41; *see Riney v. Lockheed Martin Corp.*, 831 Fed. Appx. 698, 702 (5th Cir. 2020).

When an employer offers a job because of certain qualifications, as here, a plaintiff can prove the reason false *only* by showing that he was "clearly better qualified" for the position. *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002) (citation omitted). "To carry this heavy burden, a plaintiff must show that 'the qualifications are so widely disparate that no reasonable employer would have made the same decision.'" *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 459 (5th Cir. 2019)(quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 923 (5th Cir. 2010)). "Rather, the 'losing candidate's qualifications must leap from the record and cry to all who would listen that he was vastly— or even clearly—more qualified." *Shater v. Shell Oil Co.*, No. 22-20289, 2022 WL 17250190, at *2 (5th Cir. Nov. 28, 2022). Yet, "pretext cannot be established by mere 'conclusory statements' of a plaintiff who feels [s]he has been discriminated against." *George*, 810 Fed. Appx. at 263 (quoting *EEOC v. Exxon Shipping Co.*, 745 F.2d 967, 976 (5th Cir. 1984)(quoting *Elliot v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 566 (5th Cir. 1983)). The record reflects that Smith was best suited for the MCCB's specific needs following Mayfield's departure, and Mackey cannot meet the high bar to establish he was "clearly more qualified." *Ex. 1,* pp. 12:13-13:5; *Ex. 11,* pp. 78:22-79:17; *Ex. 2,* pp. 46:19-48:20; *Ex. 16,* pp. 30:13-31:2; *Ex. 6,* pp. 74:12-17; 75:8-20

In *George,* plaintiff claimed that she was better qualified than the candidate selected for promotion. *George,* 810 Fed. Appx. at 263. The plaintiff cited that the selected candidate only had an undergraduate degree whereas plaintiff had a master's degree, more supervisory

experience, and had been employed four years longer. *Id.* The Fifth Circuit, however, found that this was insufficient to establish that the plaintiff was "clearly better qualified." *Id.* Rather, "an employer may discount both years of service and general experience in favor of specific qualifications." *Id.* Indeed, "employers are generally free to weigh qualifications or prospective employees, so long as they are not motivated by race." *Id.*; *see Taylor v. Univ. of Mississippi Medical Center*, No. 23-60246, 2024 WL 512559, at *5 (5th Cir. Feb. 9, 2024).

Although Mackey may disagree with Defendants' assessment of Smith's qualifications, it is impossible for Mackey to carry the <u>heavy</u> burden of showing that he was clearly better qualified at this pretext juncture. Mackey has no evidence to establish pretext of race discrimination.

**B.** **<u>Summary Judgment is Warranted on the §1983 Official Capacity Claims for Prospective Relief.</u>**

Mackey **<u>only</u>** seeks "prospective relief" against the Individual Defendants in their official capacities for alleged violations of §1981 and the Equal Protection Clause of the Fourteenth Amendment—both brought through 42 U.S.C. § 1983.

1. <u>The §1983 claims fail for the same reason as the Title VII claim fails against MCCB.</u>

Unlike Mackey's Title VII claim, his §1983 claims may include three discrete acts: (1) change to the educational requirements for Executive Director, (2) Smith's appointment as Interim, and (3) Smith's appointment as Executive Director. However, Mackey's §1983 claims (Equal Protection and §1981) still require him to demonstrate that the Individual Defendants intentionally discriminated against him on the basis of race. *Coleman v. Houston Indep. School Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Importantly, "[b]ecause vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each defendant who is a government official has violated the Constitution, through the official's own individual

21

actions." *Issa v. Tex. Dept. of Criminal Justice,* No. 1:22-cv-001107-ADA*, 2023 WL 4923971 at *16 (W.D. Tex. Aug. 1, 2023).

(a) <u>Change to the educational requirements</u>

It is undisputed that the Individual Defendants unanimously voted to change the educational requirements from requiring a Ph.D. to that of a Master's degree with administrative experience. *Ex. 20.* Unlike Mackey's failure to promote claims, Defendants do not assume that he can make out a prima facie case of discrimination here because he has not suffered an adverse employment action.

To make out a prima facie case of race discrimination on the change to the educational requirements, Mackey must establish: "(1) he is a member of a protected group; (2) was qualified for the position at issue; (3) . . . suffered some adverse employment action by the employer; and (4) was replaced by someone outside the protected group." *Ayorinde v. Team Indus. Serv. Incorp.*, 121 F.4th 500, 507 (5th Cir. 2024). To establish an adverse employment action, "a plaintiff need only show that she was discriminated against, because of a protected characteristic, with respect to hiring, firing, compensation, or the 'terms, conditions, or privileges of employment.'" *Hamilton v. Dallas County*, 79 F.4th 494, 506 (5th Cir. 2023). Mackey simply cannot establish that the change to the educational requirements affected a term, condition, or privilege of his employment, thus cannot establish a prima facie case.

Even assuming that he could, the Individual Defendants had legitimate, non-discriminatory reasons for this action. The educational requirements were changed based on a business decision that a Ph.D. simply was not necessary for the role and only requiring a Master's degree opened a broader applicant pool. Further, upon pressure from legislators, the Executive Director's salary was also reduced by over $100,000 from $280,000 to $175,000. *Ex. 2,* p. 48:1-11; *Ex. 10,* p. 26:5-9; *Ex. 3,* p. 17:21-25.  Mackey cannot show that these reasons were mere pretext for race discrimination.

22

(b) <u>Smith appointed Interim</u>

It is undisputed that the Individual Defendants present unanimously voted to appoint Smith as Interim upon Mayfield's departure.[11] [12]  *Ex. 9.*  It is also undisputed that MCCB does not have a formal policy or procedure for assigning the role of Interim.  *Exs. 5,* p.110:21-111:11 *and 22.* Assuming for purposes of this motion only that Mackey could establish a prima facie case, the Individual Defendants have legitimate, non-discriminatory reasons for appointing Smith as Interim.  Although not a requirement, Individual Defendants desired someone they believed would not apply for the Executive Director position as Interim to avoid that person attempting to sway the application process. *Ex. 1*, pp. 12:13-13:5; *Ex. 8,* pp. 108:22-109-110:11; *Ex. 10*, p. 73:6-25. Further, Individual Defendants firmly believed that MCCB needed an Interim who could "calm the waters" with the staff and the community college Presidents in the wake of the chaos that Mayfield left behind, including many damaged relationships. *Ex. 11,* pp.78:22-79:17; *Ex. 2,* pp.46:19-48:20; *Ex. 16,* pp.30:13-31:2; *Ex. 6,* pp.74:12-17; 75:8-20.  Smith fit the bill on both fronts, whereas the Board correctly assumed Mackey would apply for the permanent position since he had previously applied and was a finalist in 2015.[13] *Ex. 5,* p. 111:17-20; *Ex. 11,* pp.50:16-51:10. Mackey cannot establish that these reasons are merely pretextual.

---

[11] It is also undisputed that Gilbert, a white female, also did not hold a Ph.D. when she served as Interim in 2015. *Ex. 4*, p. 71:17-24; *Ex. 22.*  Further, there is no record evidence that Mackey complained her qualifications when Gilbert served as Interim.

[12] Defendant Symmes was not present for the July 16, 2021 meeting when the Board went into executive session to discuss the personnel matter of selecting an Interim when Mayfield resigned. *Ex. 9.*

[13]  The evidence establishes that Smith was not interested in the permanent Executive Director position when he was appointed as Interim, nor did he meet the educational requirements in place at the time. *Ex. 5,* pp. 49:8-50:2; *Ex. 3,* p. 23:9-22; *Ex. 4,* pp.71:13-72:10. Obviously, Smith eventually changed his mind and applied for Executive Director.

(c) <u>Smith appointed Executive Director</u>

Mackey's §1983 claims regarding Smith's appointment as Executive Director fail for the same reasons that his Title VII claim against MCCB fails. The Individual Defendants incorporate all arguments set forth in Section V.A.1-2 above.

2. <u>Regardless, there is no feasible *Ex parte Young* relief because another employee must be bumped to accomplish instatement.</u>

Even assuming Mackey's §1983 claims survive on the merits, the Court cannot fashion the "prospective relief" sought pursuant to the *Ex parte Young* doctrine.[14] This Court has previously dismissed Mackey's front pay claims. *Order* [38, p. 8]. Specifically, the Court cited *Jones v. Texas Juvenile Justice Department*, 646 F.App'x 374, 376-77 (5th Cir. 2016) "where the Fifth Circuit held that 'the Eleventh Amendment bars [Plaintiffs] from recovering . . . front pay.'"[15] [16] Likewise, any claims for back pay against the Individual Defendants in their official capacities are also barred by the Eleventh Amendment. *Id.*

Although the Court has acknowledged that instatement to Executive Director "raises a tougher question", it is not feasible where an innocent employee, Smith, must be displaced to accomplish that relief.[17] [38, p. 8]. MCCB only has **one** Executive Director, so to instate Mackey, Smith must be fired, demoted, or otherwise "bumped."

"Instatement is not feasible when 'it would require the Court to bump an innocent person out of a job to accommodate Plaintiff.'" *Jackson v. Duff*, No. 3:24-cv-00308-KHJ-MTP, 2025 WL 35981, at *5 (S.D. Miss. Jan. 6, 2025)(quoting *Lopez v. City of Biloxi*, No. 1:03-cv-

---

[14] In his Amended Complaint, as "prospective relief" Mackey seeks "instatement to the position, front pay, and back pay." [44, Section V(a), p. 10].

[15] This Court has previously held that MCCB is an arm of the state "protected by Eleventh Amendment immunity. . . ." *Order* [38, p. 6]. Likewise, the Individual Defendants in their official capacities are entitled to this immunity since "a suit against the members of an institution 'in their official capacities is the same as a suit against the [institution] itself." *Jackson,* 2025 WL 35981 *4 (quoting *Thomas v. Inv. of Miss.*, No. 3:18-cv-62, 2018 WL 6613807, at *2 (N.D. Miss. Dec. 17, 2018)). Thus, Mackey may only seek prospective relief through the *Ex parte Young* doctrine.

[16] This Court has also previously ruled that "[t]he official capacity claims for money damages against the individual defendants are dismissed." *Order* [38, p. 7].

[17] The Amended Complaint contains no allegations of race discrimination against Smith. [44].

122, 2006 WL 839523, at *7 (S.D. Miss. Mar. 29, 2006)).[18]  "Indeed, the Supreme Court has cautioned against the use of a remedy that 'bumps' one employee from a position in order to fill it with a victim of discrimination." *Id.* (quoting *Walsdorf v. Bd. of Comm'rs for E. Jefferson Levee Dist.*, 857 F.2d 1047, 1054 (5th Cir. 1998)(citing *Firefighters Loc. Union No. 1784 v. Stotts*, 467 U.S. 561, 579 (1983)). *Jackson* presents strikingly similar facts and claims to those at bar. *Id.*  There, Judge Johnson found *Ex parte Young* inapplicable and dismissed the §1983 Equal Protection claims against individually named Institute of Higher Learning board members in their official capacities because instatement would require removing the current Jackson State University president to instate plaintiff. *Jackson*, 2025 WL 35981, at *5. Accordingly, the Court should dismiss the claims against the Individual Defendants in their official capacities because instatement of Mackey is not feasible where an innocent third party must be displaced.

### C.    The Individual Capacity Claims for Money Damages Also Fail and These Defendants Are Entitled to Qualified Immunity.

1.    Plaintiff does not assert a single cause of action against the Individual Defendants in their individual capacities.

It is axiomatic that a plaintiff must allege a cause of action and establish some violation of state or federal law to recover damages from a defendant.  In his Amended Complaint, Mackey failed to assert a single cause of action against the Individual Defendants in their individual capacities. [44, p. 9, ¶ 36]. Indeed, the only mention of the individual capacity Defendants appear in the "Parties" section and in the prayer for relief.  *Id.*, pp. 2-3, ¶¶ 4-13; p. 10, ¶¶ b and e. For that reason alone, any claim for damages against the individual

---

[18] This approach is followed in the Fifth Circuit as well as many others.  *See Ray v. Iuka Special Min. Separate Sch. Dist.*, 51 F.3d 1246, 1254 (5th Cir. 1995)(district court did not abuse its discretion in denying reinstatement where there were no existing vacancies in school district and where reinstating plaintiff would require displacement of existing employee); *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822-23 (5th Cir. 1990)(upholding district court's order that reinstatement is not feasible because plaintiff had been replaced and reinstatement would disrupt the employment of others); *Kraemer v. Franklin and Marshall College*, 941 F.Supp. 479 482-83 (E.D. Penn 1996)(collecting cases).

capacity Defendants should be dismissed. *Nemick v. Stevens,* No. 16-cv-003220BLF, 2017 WL 2834120 (N.D. Ca. June 30, 2017)(dismissing defendant where no cause of action asserted and defendant only mentioned in prayer for relief); *Holliday v. Bank of America, N.A.*, No. SA-11-CV-1133-XR, 2013 WL 1704905, at *7 (W.D. Tex. April 19, 2013)(granting summary judgment where plaintiff's complaint, even liberally construed, does not assert a cause of action against defendant); *Chong Sok Ahn v. Barrett, Daffin, Frappier, Turner & Engle, LLP,* No.4:11-cv-358, 2011 WL 5080262, at *2 (E.D. Tex. Sept. 21, 2011)("without a single cause of action being asserted there can be no claim for . . . relief").

At this late stage in the litigation, Mackey cannot remedy this problem since he may not amend his Amended Complaint through a response to a motion for summary judgment. "Claims and supporting factual allegations must be raised in the complaint and may not be presented only in a response to a motion to dismiss or in a motion for summary judgment." *Ewing v. Richie*, No. 1:16-cv-90-HSO-JCG, 2017 WL 724343, *2 (S.D. Miss. Jan. 9, 2017)(additional citations omitted); *Cutera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 133 (5th Cir. 2005)("[a] claim which is not raised in the complaint, but rather, is only raised in response to a motion for summary judgment is not properly before the court.");*Carlisle v. Elite Trucking Services, LLC*, No. 1:16-cv-257-HSO-JCG, 2016 WL 11608938, *2 (S.D. Miss. Sept. 30, 2016)(same).[19]  This is particularly true here since the deadline to amend has long passed, extensive discovery was conducted, and discovery has closed.[20] Summary judgment should be granted on all individual capacity claims for damages.

---

[19] The Fifth Circuit has previously allowed new claims to be treated as motions to amend.  *See Stover v. Hattiesburg Public School District*, 549 F.3d 985, 989 (5th Cir. 2008), *accord Pierce v. Hearne Ind. Sch. Dist.*, 600 F.App'x 194, 200 (5th Cir. 2015).  However, more recently the Fifth Circuit has recognized this inconsistency and questioned the amendment approach.  *See Jackson v. Gautreaux*, 3 F.4th 182, 189 (5th Cir. 2021) (noting it is "unclear how cases like *Pierce* are consistent with our rules of orderliness" and that construing new claims as motion for leave to amend is normally reserved for pro se plaintiffs); *accord Ford v. Anderson County*, 102 F.4th 292, 318 (5th Cir. 2024).

[20] A total of seventeen (17) depositions have been conducted in this case and the discovery period closed on March 31, 2025.

2.  <u>Should the Court somehow infer §1981 and/or Equal Protection claims against the Individual Defendants, those claims also fail on the merits and the Individual Capacity Defendants are entitled to qualified immunity.</u>

In the alternative, should the Court infer §1983 claims against the Individual Defendants in their individual capacities (which it should not), those claims fail on the merits for the same reasons that the official capacity §1983 claims fail. Individual Defendants incorporate all arguments set forth above in Section V.B.1(a)-(c).

Regardless, the Individual Defendants in their individual capacities are entitled to qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)(quotation omitted).[21] A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011). "Both steps in the qualified immunity analysis are questions of law." *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013). The Court is free to decide which prong of the qualified immunity analysis to address first. *See Pearson*, 555 U.S. at 242.

The threshold question is "whether Plaintiff's allegations establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). If "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries

---

[21] "The cloaking of state actors with a qualified immunity is grounded in the belief that a government cannot operate efficiently if its employees and agents are subjected to the costly and time-consuming rigors of trial and discovery. Instead, state actors should be able to act freely, <u>within the bounds prescribed by law</u>, but without the fear of consequences." *Burns-Toole v. Byrne*, 11 F.3d 1270, 1273-74 (5th Cir. 1994)(emphasis added). This is particularly true here, since the Individual Defendants were selected by various governors to serve the state of Mississippi through their work with MCCB for nothing more than a $40 per meeting per diem payment. "The absence of this immunity would, as Judge Learned Hand has said, 'dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.'" *Id.* at 1274.

concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194 (2001), succeeded from on other grounds by *Pearson*, 555 U.S. at 223. However, "if a violation could be made out, the next sequential step is to ask whether the right was clearly established." *Id.* at 201.

It is the <u>plaintiff</u> who bears the burden of rebutting the application of qualified immunity. *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997). Once a defendant properly invokes the defense of qualified immunity, the <u>plaintiff</u> bears the burden of proving that the defendant is not entitled to the doctrine's protection. *See Michalik v. Hermann*, 422 F.3d 252, 258 (5th Cir. 2005). "[T]o avoid summary judgment on the grounds of qualified immunity, '[t]he plaintiff must present specific, nonconclusory factual allegations that establish improper motive and must affirmatively identify evidence from which a jury could find that the plaintiff has carried his or her burden of proving the improper motive." *Felton v. Polles*, No. 3:99CV200LN, 2000 WL 33968259 (S.D. Miss. Jan. 14, 2000)(citation omitted); *see Coleman*, 113 F.3d at 533-34 (to establish race discrimination under §1983, whether pursuant to the Equal Protection Clause or §1981, plaintiff must demonstrate intentional discrimination);*Washington v. Jackson State University*, No. 3:07cv00074-DPJ-JCS, 2008 WL 2779297, at *8 (S.D. Miss. July 14, 2008)(same). Further, "that standard requires a plaintiff to 'demonstrate what <u>each defendant</u> did to violate the asserted constitutional right.'" *Wallace v. City of Jackson*, No. 3:21-cv-326-KHJ-MTP, 2023 WL 3573907, at *7 (S.D. Miss. May 18, 2022)(emphasis added); *Coleman*, 113 F.3d at 534 ("it is firmly established that individual liability under §1983 may not be predicated on vicarious liability").

As to the change in the education requirements, Mackey cannot show that this was a constitutional violation, and the Court's analysis should end there. *Washington*, 2008 WL 2779297 at *7("If the defendant's conduct did not violate [the] plaintiff's constitutional rights under the first prong. . . he is entitled to qualified immunity.").

As to the failure to promote claim, this Court has recognized that "failure to promote an employee based on their membership in a protected class was constitutionally proscribed at the time of the purported misconduct." *Order* [38, p. 15](citing *Stark v. Univ. of S. Miss.*, 8 F. Supp. 3d 825, 838 (S.D. Miss. 2014)(citing *Irby v. Sullivan*, 737 F.2d 1418, 1431 (5th Cir. 1984)). Nonetheless, Mackey cannot satisfy his burden to show that each of the Individual Defendants intentionally discriminated against him based on his race by promoting Smith rather than him, nor that any of their actions in voting for Smith were objectively unreasonable.[22] The record is completely devoid of evidence of intentional race discrimination by any of the Individual Defendants, thus the §1983 claims fail on the merits and the Individual Defendants are also entitled to qualified immunity. *Washington*, 2008 WL 2779297 at *8 (defendants entitled to qualified immunity where a "diligent review of Plaintiff's voluminous submissions reveals no credible evidence of discriminatory, racial animus on the part of the individual Defendants."); *Jackson v. Houston Indep. School Dist.*, 189 F.3d 467, *7 (5th Cir. 1999)(defendant entitled to qualified immunity where plaintiff has a constitutional right to be free from racial discrimination in employment, but the evidence does not establish that he acted in an objectively unreasonable manner); *Hodges v. City of Houston,* 35 F.3d 562, *2 (5th Cir. 1994)(defendant entitled to qualified immunity where plaintiff failed to produce sufficient evidence that the defendant's conduct violated clearly established rights); *Burns-Toole*, 11 F.3d at 1274-75 (same); *Felton*, 2000 WL 33968259 at *2-*3 (same); *Senu-Oke v. Jackson State University*, 521 F.Supp.2d 551, 559-60 (S.D. Miss. 2007)("plaintiff has failed to create a genuine issue of material fact on his claim of intentional

---

[22] Defendant Symmes did not participate in the selection of Smith as Interim. *Ex. 9*. Defendant Carmichael was not present when Smith was selected as Executive Director and only voted to adopt the minutes of that January 20, 2023 meeting. *Ex. 23*, p. 45:10-23.

discrimination so that defendants are entitled to qualified immunity (as well as to summary judgment on the merits.").

## VI.    CONCLUSION

For all of the reasons stated above, Defendants are entitled to summary judgment on all of Mackey's claims.

RESPECTFULLY SUBMITTED, this the 14th day of April, 2025.

> **JOHN PIGOTT, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, CHERYL THURMOND, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES, VIDET CARMICHAEL, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, DONNIE CAUGHMAN, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, BUBBA HUDSPETH, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, DOLLY MARASCALCO, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES, JOHNNY MCRIGHT, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, LUKE MONTGOMERY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES. WILL SYMMES, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, DIANNE WATSON, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES, AND THE MISSISSIPPI COMMUNITY COLLEGE BOARD**, *Defendants*
>
> **LYNN FITCH, ATTORNEY GENERAL STATE OF MISSISSIPPI**
>
> */s/ Lindsay Thomas Dowdle*
> Special Assistant Attorney General

Lindsay Thomas Dowdle (MSB# 102873)
Quentin A. Daniels (MSB# 10408)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi  39205-0220
Tel.:  (601) 359-3020
Fax:  (601) 359-2003
lindsay.dowdle@ago.ms.gov
quentin.daniels@ago.ms.gov